NOT FOR PUBLICATION (Doc. No. 76)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

|  |  |  |
|---|---|---|
| JAMES GEORGE JATRAS and KATHY PAPPAS JATRAS, | : : : : | |
| Plaintiffs, | : : | Civil No. 09-3107 (RBK/KMW) |
| v. | : : | **OPINION** |
| BANK OF AMERICA CORP. et al., | : : | |
| Defendants. | : : | |

**KUGLER**, United States District Judge:

This matter comes before the Court upon the motion to dismiss filed by all named Defendants.[1] Defendants move to dismiss claims of common law fraud, breach of the implied covenant of good faith and fair dealing, and violation of the New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. § 56:8-2. Plaintiffs argue, inter alia, that Defendants fraudulently approved a home mortgage loan by inflating the value of the collateral and failing to account for all of Plaintiffs' debt when determining Plaintiffs' eligibility. Defendants argue that Plaintiffs

---

[1] The Defendants named in this litigation are: Bank of America Corporation ("BOA"), Bank of America Home Loans ("CHL"), Countrywide Financial Corporation ("CFC"), Countrywide Bank, FSB ("CB"), Treasury Bank, N.A. ("TB"), ReconTrust Company, N.A. ("Recon"), Countrywide Securities Corporation ("CSC"), Mortgage Electronic Registration Systems, Inc. ("MERS"), The Bank of New York Mellon FKA The Bank of New York as Trustee for the Benefit of the Certificate Holders, CWALT, Inc., Alternative Loan Trust 2007-1T1 Mortgage Pass-through Certificates, Series 2007-1T1 ("BONYM"), Colleen Reed, Loraine Raymer, Angelo Mozilo, David Sambol, and Other Undiscovered Parties.

  CHL is the loan origination arm of CFC through CB, which is also a unit of CFC. TB is a federally chartered national banking association and an affiliate of CHL owned by BOA. Recon is a wholly owned subsidiary of BOA. CSC is a wholly owned subsidiary of CFC that underwrites offerings of mortgage-backed securities. Colleen Reed was the Branch Manager for CHL's office in Mays Landing, New Jersey. Loraine Raymer is an employee of CB in the Office of the President. Angelo Mozilo was the Chairman and Chief Executive Officer of CFC.

failed to allege any form of fraud in connection with their home mortgage loan.  For the following reasons, Defendants' motion is GRANTED.

I.      BACKGROUND

Because this matter is before the Court on a motion to dismiss, the following facts are taken from the Second Amended Complaint and assumed true.

Plaintiffs James and Kathy Jatras live in Virginia.  In December 2006, they purchased a home in Cape May, New Jersey for $1,305,000.00, subject to financing obtained through CHL.  After Plaintiffs signed the purchase contract, they contacted CHL to secure financing.  CHL asked Plaintiffs to provide information concerning their assets, income, and liabilities.  Plaintiffs provided CHL with this information along with a copy of the Purchase Contract.  CHL told Plaintiffs that they would review Plaintiffs' financial information and offer financing based upon the rates and programs available.  After reviewing Plaintiffs' financial information, CHL informed Plaintiffs that it was prepared to offer them eighty percent of the purchase price of the property, with a fixed interest rate of 6.5 percent for thirty years.  Thereafter, Plaintiffs accepted CHL's offer, pending verification of all final qualification data.

According to Plaintiffs, during the period between CHL's offer and closing, CHL employees contacted Plaintiffs for additional information.  In particular, CHL requested information concerning Plaintiffs' income and assets.  Included in this information was a specific reference to the rent Plaintiffs paid monthly for an apartment they rented in Northern Virginia.  Plaintiffs made clear to Defendants that they intended to remain in the apartment following their purchase of the property in Cape May.[2]

---

[2] In addition to the aforementioned facts, the Second Amended Complaint contains a forty-two page description of all of Plaintiffs' interactions with CHL and a lengthy analysis and critique of CHL's computerized loan underwriting and collateral valuation systems.  However, the portion of the Second Amended Complaint relevant to this Motion is the detailed discussion of Defendants' alleged criminal scheme to defraud Plaintiffs by approving the home

1. **The Form 1003**

At closing, Defendants presented Plaintiffs with the Uniform Residential Loan Application, also known as the "Form 1003." According to Plaintiffs, the Form 1003 is "prepared by the lender . . . in part from information provided by the borrower and in part from CHL's own internal information, and then presented at closing to the borrower[]. . . ." (Second Am. Compl. ¶ 25). Plaintiffs allege that prior to signing the Form 1003, they conducted a "reasonable on-the-spot inspection" and confirmed that "the information [contained in the form] appeared accurate to the best of [their] ability to verify. . . ." (Id.). During the inspection, Plaintiffs failed to identify any incorrect information concerning their debt-to-income ratio or the appraisal value of the property.

Later, after signing the Form 1003, securing the loan, and purchasing their $1.3 million dollar home, Plaintiffs conducted a more thorough inspection of the Form 1003. During this inspection, Plaintiffs learned that Defendants did not include their monthly rental payment of $2,000.00 in the debt-to-income ratio. (Id. ¶ 47). Plaintiffs allege that if Defendants properly included their $2,000 rent into the calculation of Plaintiff's debt-to-income ratio "the loan would have been denied (or the loan approved only at a lower amount) due to CHL's investor-approved guidelines pertaining to ratios designed to determine the borrower's ability to repay the debt." (Id.).

2. **CHL's Advertising**

Plaintiffs allege that Defendants fraudulently advertised their products and services. Plaintiffs allege that through their advertisements, Defendants' expressly or impliedly guaranteed suitable and affordable loans for each prospective borrower based on an accurate assessment of

---

mortgage loan. Therefore, the Court will focus solely on the facts alleged in the Second Amended Complaint that specifically relate to Defendants' alleged scheme to defraud Plaintiffs.

each prospective borrower's credit rating and ability to pay.  In particular, Plaintiffs allege that CHL published a variety of television, radio, and print advertisements touting themselves as "the company you can trust," and encouraging potential customers to "join the millions of homeowners who have trusted Countrywide."  (Id. ¶ 38).  CHL also proclaimed to prospective borrowers that "Countrywide is on your side!", that "[CHL] had years to perfect [its] craft," and that CHL offered customers "industry leading expertise."  (Id.).  Finally, CHL pledged to offer products that "match a family's income level or credit profile," and promised that each loan was "built to suit specific needs of [CHL] customers."  (Id.).

### 3. The Collateral Appraisal Process

Defendants determined that based upon the information Plaintiffs provided to them during the loan application process, the value of the house was $1,315,000.00.  After Plaintiffs conducted an examination of the documents presented to them at closing, including the Form 1003 and CHL's appraisal of the property, they determined that CHL falsified the value of the property.  (Id. ¶ 30).  Plaintiffs' alleged these specific objections to Defendants' collateral appraisal process:

> (1) Defendants improperly valued the property nine months after the date of sale.  At the time Defendants approved the loan, Plaintiffs allege that "it was considered inappropriate to use comparables over 90 days old . . . ."
> (2) Defendants failed to include a "Date of Time/Sale" value adjustment.  According to Plaintiffs, if the date of sale time is extended beyond 90 days, an offsetting "Date of Sale/Time" value adjustment is required.
> (3) Defendants improperly compared the property to "harbor view" residences in order to inflate the value of the property.  Plaintiffs allege that this comparison was improper because the property is listed as "residential," and not "harbor view."  Plaintiffs allege that properties that provide occupants with a view of the water are "significantly more desirable" and therefore command higher prices.

      (4) Defendants improperly compared the one-story property to a three-story property.

(Id. ¶ 53). According to Plaintiffs, these "gross violations of underwriting standards" artificially inflated the value of the property. (Id.).

### 4. "Criminogenic" Environment

In addition to the aforementioned allegations, the Second Amended Complaint contains a detailed description of the allegedly "criminogenic 'corporate culture'"[3] at CHL, CB, TB, Recon, and CSC. (Id. ¶ 67) (internal quotations omitted). Plaintiffs allege that Defendants Mozilo and Sambol purposefully created an environment where "obvious fraud . . . was not detected and thwarted but was encouraged and rewarded with bonuses and other compensation enhancements." (Id. ¶ 68). This allegedly "criminogenic environment" consisted of the following components. First, Plaintiffs allege that CHL knew that investors generally agreed to purchase mortgage-backed securities based upon the guarantees implied by CHL's underwriting process. As a result of this knowledge, CHL advertised their underwriting guidelines to investors and insurers. (Id. ¶ 70). In particular, CHL boasted that before calculating the debt-to-income ratio for each prospective borrower, it collected all applicable income, liability, asset, employment, credit, and property information. Second, Plaintiffs allege that CHL sought to "write[] as many mortgage loans as possible – and at the highest interest rates and fees possible – regardless of the creditworthiness [of the borrower] or evident fraud." (Id. ¶ 71). According to Plaintiffs, Defendants underwrote a large number of home loans with high interest rates and fees for the purpose of selling mortgage-backed securities on the secondary market. As a result of these allegedly fraudulent underwriting practices, CHL approved loans based upon inadequate

---

[3] Plaintiffs define a "criminogenic environment" as an environment "that contributes to or supports the formation of predatory criminal morals, thinking, and behavior, and where actors in such environment not only do not guard against or thwart criminal activity but are rewarded for it." (Second Am. Compl. ¶ 36).

5

documentation, missing verifications, title defects, excessive debt-to-income ratios, inadequate credit scores, and other material violations of lending guidelines.

Plaintiffs also allege that the criminogenic environment at CHL involved the intentional inflation of collateral. Because CHL originated and securitized home loans, Plaintiffs allege that CHL had an incentive to raise the value of each property above its actual value. Furthermore, according to Plaintiffs, loans based on inflated collateral are more likely to default and produce insufficient assets to repay a second lien holder in foreclosure, and therefore a borrower is harmed because he or she owns an "underwater loan."

### 5. Individual Defendants

The Second Amended Complaint alleges that the following individuals are liable for the fraudulent acts of CHL. First, Plaintiffs allege that Defendant Reed falsified data while processing Plaintiffs' loan and concealed material facts known to CHL. Plaintiffs allege that Reed improperly entered and processed data in CHL's computerized underwriting system ("CLUES"), and engaged in other fraudulent activity at the loan desk with intent to defraud Plaintiffs.

Plaintiffs also allege that Defendants CFC, TB, CB, Recon, and CSC are directly responsible for creating a fraudulent environment at CHL, and that Defendant BOA is liable as a "successor in interest" to CHL, CFC, TB, CB, Recon, and CSC for purchasing the Countrywide companies in 2008 despite the immense amount of information concerning CHL's fraudulent activity available in the public domain. According to Plaintiffs, BOA's Chairman and Chief Executive Officer, Mr. Kenneth D. Lewis, stated in January 2009: "We are aware of the issues within the housing and mortgage industries. The transaction [i.e., BOA's Countrywide acquisition] reflects those challenges." (Id. ¶ 80).

Finally, Plaintiffs allege that MERS is liable for CHL's allegedly fraudulent acts for "purporting to serve as nominee for Countrywide based on an invalid and enforceable instrument obtained by fraud." (Id. ¶ 81). At the time BOA "assigned" rights to Plaintiffs' loan to BONYM, both BOA and MERS knew that the instrument may have been the product of fraud.

On June 24, 2009, Plaintiffs, proceeding pro se, filed the Complaint in this Court. On July 15, 2009, they amended. The Amended Complaint asserted 5 counts: Conversion; Fraud; Consumer Fraud in violation of the NJCFA; "Detrimental Reliance"; and violations of the Civil Racketeer and Corrupt Organization Act (RICO), 18 U.S.C. § 1962(a), (c), and (d). On April 22, 2010, the Court dismissed all of Plaintiffs' claims without prejudice and granted Plaintiffs leave to amend the Complaint in order to allege additional circumstances that might support a fraud claim. On May 24, 2010, Plaintiffs filed the Second Amended Complaint alleging claims of common law fraud, violation of the New Jersey Consumer Fraud Act ("NJCFA"), and breach of the implied covenant of good faith and fair dealing. Defendants filed the present Motion to Dismiss on June 14, 2010, and Plaintiffs timely responded. The motion is now ripe for review.

## II.     STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss an action for failure to state a claim upon which relief can be granted. With a motion to dismiss, "'courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (quoting Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008)). In other words, a complaint survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

In making this determination, a court must engage in a two-part analysis. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009); Fowler, 578 F.3d at 2010-11. First, the court must separate factual allegations from legal conclusions. Iqbal, 129 S. Ct. at 1949. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. Second, the court must determine whether the factual allegations are sufficient to show that the plaintiff has a "plausible claim for relief." Id. at 1950. Determining plausibility is a "context-specific task" that requires the court to "draw on its judicial experience and common sense." Id. A complaint cannot survive where a court can only infer that a claim is merely possible rather than plausible. See id.

### III. DISCUSSION

#### A. Common Law Fraud

The elements of common law fraud are well-documented. A common law fraud claim contains the following: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity, (3) intent that the other party relies on it, (4) reasonable reliance by the other party, and (5) resulting damages. Gennari v. Weichert Co. Realtors, 691 A.2d 350, 367 (N.J. 1997). Under Federal Rule of Civil Procedure 9(b), a party must plead fraud with particularity. Fredericko v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007). A party claiming fraud must "allege the date, time, and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." Id.

Despite the voluminous allegations in the Second Amended Complaint, once again, Plaintiffs fail to meet this exacting standard.

### 1. Reliance

In order to plead common law fraud, a plaintiff must prove that he reasonably relied upon a misrepresentation or omission of material fact. Banco Poplar N. Am. v. Gandi, 876 A.2d 253, 260 (N.J. 2005); Gennari, 691 A.2d at 367. Where a party knows that a representation is untrue, the party cannot reasonably rely upon it. Int'l Minerals and Min Corp. v. Citicorp N. Am., 736 F. Supp. 587, 598 (D.N.J. 1990).

In the Court's opinion on April 22, 2010, it made clear that Plaintiffs failed to allege reliance because "Plaintiffs [did] not allege that they were hoodwinked into not looking at the loan documents or otherwise prevented from reading and understanding their own financial information." Jatras, 2010 WL 1644407, at *4. Moreover, the Court noted that Plaintiffs failed to allege reliance with respect to the value of the property because Plaintiffs came to Defendants claiming what the house was worth and Defendants simply confirmed that value. Id. Now, Plaintiffs argue that: (1) Defendants, not Plaintiffs, set the value of the property; (2) Plaintiffs did not have an equal or better understanding of their ability to pay the loan compared to Defendants; and (3) Plaintiffs would have suffered no injury if Defendants declined their request for financing because Plaintiffs could have taken other "alternative actions" open to them at the time of the transaction. (Pl.'s Opp'n Br., at 13). Defendants argue that: (1) Plaintiffs' argument that they relied on Defendants' valuation fails because Plaintiffs entered a binding contract to purchase the property for $1.3 million prior to interacting with Defendants; (2) Plaintiffs could not rely upon misrepresentations concerning their own income and expenses; and (3) Plaintiffs argument that they would have suffered no injury if Defendants declined their request for financing because they could have taken other "alternative actions," is effectively the same

improvident lending claim rejected by this Court in the Opinion on April 22, 2010. (Def.'s Reply Br., at 5-7).

The Court finds that the Second Amended Complaint once again fails to allege reliance. First, Plaintiffs' argument that Defendants set the value of the property does not rescue them from this Court's prior determination that they did not <u>rely</u> upon Defendants' valuation. Even if Defendants set the value of the property, the Court cannot ignore the fact that Plaintiffs entered into a contract to purchase the house before they contacted Defendants to secure funding. The Second Amended Complaint alleges that "[i]n December 2006, [Plaintiffs] entered into a Purchase Contract for [the property] for $1,305,000 with sellers William and Tarice Patton." (Second Am. Compl. ¶ 18). Plaintiffs do not allege that Defendants' valuation, which occurred subsequent to the Purchase Contract, influenced their negotiations with William and Tarise Patton. Nor do Plaintiffs allege that they sought pre-approval of a $1.3 million loan from CHL prior to their negotiations with William and Tarise Patton. Thus, because Plaintiffs entered into the purchase contract <u>before</u> they contacted Defendants, it simply defies reason for Plaintiffs to now argue that they detrimentally relied on Defendants' valuation when they secured the mortgage loan. In effect, as the Court noted in the Opinion on April 22, 2010, "[Plaintiffs] came to Defendants claiming that the house was worth what they requested . . . [and] [t]he appraisal facilitated giving Plaintiffs exactly what they asked for; it did not induce them to ask." <u>Jatras</u>, 2010 WL 1644407, at *4.

Second, Plaintiffs' argument that they did not have an "equal or better understanding of their ability to pay the loan" is equally unpersuasive. Plaintiffs were in sole possession of information concerning their income and expenses. Plaintiffs provided this information to Defendants so that Defendants could assess their ability to make mortgage payments.

10

Defendants then agreed to finance Plaintiffs' purchase based upon information provided by Plaintiffs. The Second Amended Complaint does not allege that Plaintiffs were coerced into signing the loan or "hoodwinked into not looking at the loan documents." Moreover, it is abundantly clear that Plaintiffs had a more thorough understanding of their own financial situation than Defendants. Therefore, this Court is not convinced that Plaintiffs detrimentally relied upon Defendants' assessment of their financial health when they secured the loan. See Int'l Minerals & Mining Corp., 736 F. Supp. at 598 (finding reliance unreasonable where parties knew that representation could not be true).

### B. New Jersey Consumer Fraud Act

In the Opinion dated April 22, 2010, the Court summarily dismissed Plaintiffs' NJCFA claim stating that "[b]ecause Plaintiffs have failed to state a claim for fraud . . . they have also failed to state a NJCFA claim." Jatras, 2010 WL 1644407, at *5 (citing Int'l Minerals, 736 F. Supp. at 599) (holding that NJCFA claim failed when underlying common law claim failed)). Plaintiffs argue that this result was improper because common law fraud is not a predicate for liability under the NJCFA.

To state a claim under the NJCFA, a plaintiff must show: (1) unlawful conduct by the defendants; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the unlawful conduct and the ascertainable loss. Deutsche Bank Nat. Trust Co. v. Lacapria, No. 08-2174, 2010 WL 715617, at *5 (D.N.J. Mar. 1, 2010); Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc., 929 A.2d 1076, 1086 (N.J. 2007). Moreover, the "[f]acts supporting [an] unlawful practice, ascertainable loss and causation must be pled with particularity," because "a Consumer Fraud Act claim pursued in federal court is also subject to Rule 9(b)." Mitchell v. Walters, No. 10-1061, 2010 WL 3614210, at *7 (D.N.J. Sept.

08, 2010). At common law, a plaintiff may allege causation by showing that the plaintiff relied on the defendant's misrepresentations or omissions. In re Mercedes-Benz Tele Aid Contract Litig., 257 F.R.D. 46, 74 (D.N.J. 2009) (citing Varacallo v. Mass. Mut. Life Ins. Co., 752 A.2d 807, 817 (N.J. Super. Ct. App. Div. 2000)). However, unlike common law fraud, which requires allegations that the plaintiff relied on the defendant's misrepresentations or omissions, the NJCFA does not require a plaintiff to demonstrate that he actually relied upon any misrepresentation or omission. Int'l Union of Operating Eng'rs Local No. 68, 929 A.2d at 1087 ("Our CFA does not require proof that a consumer has actually relied on a prohibited act in order to recover."). Instead, the NJCFA requires merely "a causal nexus between the 'method, act, or practice declared unlawful' and the consumer's 'ascertainable loss.'" Varacallo, 752 A.2d at 817 (citing N.J. Stat. Ann. § 56:8-19).

Plaintiffs argue that the difference between the current value of their home and the purchase price of their home, as well as the alleged harm to their finances and credit-rating was caused by Defendants' alleged misrepresentations and/or omissions. Defendants argue that because Plaintiffs determined to purchase the house for a specific price before they requested financing, and Defendants did not misrepresent to Plaintiffs their own financial ability to pay back the loan, Plaintiffs cannot prove causation.

For the following reasons, the Court finds that Plaintiffs fail to allege causation. First, as Defendants correctly note, Plaintiffs independently promised to pay $1.3 million for the property before they contacted CHL for funding. Plaintiffs do not allege that CHL induced them into entering into the Purchase Contract, or that CHL preapproved the loan. The allegations in the Second Amended Complaint make clear that CHL merely lent Plaintiffs the money to pay for the property Plaintiffs contracted for. Thus, the proximate cause of Plaintiffs' financial troubles is

their own imprudence. Even if Plaintiffs' agreed to borrow $1.3 million dollars from Defendants based on incorrect information presented to them in the loan documents, there is no causation because Plaintiffs independently agreed to pay $1.3 million for the property. Plaintiffs could satisfy this obligation by borrowing $1.3 million from CHL or another financial institution, or by paying the money from their own bank account.[4] Therefore, because Plaintiffs' cannot prove that any alleged misrepresentation or omission by Defendants was the proximate cause of their losses, their NJCFA claim fails.

### C. Covenant of Good Faith and Fair Dealing

In New Jersey, every contract contains an implied covenant of good faith and fair dealing. Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assoc., 864 A.2d 387, 395 (N.J. 2005); Sons of Thunder, Inc. v. Borden, Inc., 690 A.2d 575, 587 (N.J. 1997). Generally, New Jersey courts define good faith as "honesty in fact and the observance of reasonable conduct that does not violate community standards of fair dealing in the trade." N.J. Stat. Ann. 12A:2-103(1)(b). Generally, good faith conduct is conduct that comports with "community standards of decency, fairness or reasonableness." Brunswick Hills, 864 A.2d at 395 (internal quotations omitted). In order to succeed on a claim for breach of the covenant of good faith and fair dealing, a plaintiff must prove that: (1) a contract exists between the plaintiff and the defendant; (2) the plaintiff performed under the terms of the contract [unless excused];

---

[4] Plaintiffs argue that they could have pursued other alternatives such as "(1) present[ing] [the] sellers with the correctly underwritten value as a counteroffer to the purchase contract price; or (2) withdraw[ing] from the purchase contract due to their inability to secure financing at the sales price." (Pl.'s Opp'n Br., at 14). These arguments are unavailing. First, Plaintiffs do not allege that the Purchase Contract grants them the right to withdraw from the agreement if a prospective lender values the property at a different price than the price contained in the purchase contract. Second, Plaintiffs do not allege that the Purchase Contract entitled them to the right to withdraw from the agreement if a prospective lender fails to properly include all of their expenses when calculating their debt-to-income ratio. Because Plaintiffs do not attach a copy of the Purchase Contract to the Second Amended Complaint, it is unclear whether Plaintiffs were contractually entitled to exercise these options. Although the Complaint alleges that Plaintiffs entered the Purchase Contract "subject to financing offered by Countrywide," Plaintiffs argue that the cause of their losses was Defendants' allegedly fraudulent valuation process and calculation of Plaintiffs' debt-to-income ratio, not the mere fact that Defendants loaned Plaintiffs $1.3 million. Accordingly, Plaintiffs fail to allege causation.

13

(3) the defendant engaged in conduct, apart from its contractual obligations, without good faith and for the purpose of depriving the plaintiff of the rights and benefits under the contract; and (4) the defendant's conduct caused the plaintiff to suffer injury, damage, loss or harm. Wade v. Kessler. Inst., 778 A.2d 580, 586 (N.J. Super. Ct. App. Div. 2001).

Plaintiffs argue that Defendants violated the implied covenant of good faith and fair dealing. Specifically, Plaintiffs argue that Defendants satisfied the elements of a cause of action for breach of the implied covenant of good faith and fair dealing by alleging that: (1) they entered into a valid contract with Defendants; (2) Defendants acted in bad faith and with criminal intent when they deprived Plaintiffs of the right to enjoy the benefit of the their loan agreement; and (3) Defendants' actions caused Plaintiffs' damages.

The court finds that for the same reasons that Plaintiffs failed to allege causation on their NJCFA claim, Plaintiffs' also fail to allege causation on their breach of the covenant of good faith and fair dealing claim. Because Plaintiffs determined the purchase price of the house and entered into a purchase contract prior to contacting Defendants, and Defendants cannot misrepresent to Plaintiffs' their own ability to make loan payments, Plaintiffs cannot prove that there is a causal nexus between Defendants' alleged conduct and their harm. In effect, the allegations in the Second Amended Complaint show that Plaintiffs suffered harm because they entered into a purchase contract to buy a home that they simply could not afford.[5]

### D. Individual Defendants

#### 1. Defendants Mozilo and Sambol

In New Jersey, the general rule is that a corporate officer or director is not personally liable for the torts of a corporation based solely upon his official position within the corporation.

---

[5] The Court notes that Plaintiffs have not alleged any damages or losses aside from the harms alleged in their common law fraud and NJCFA claims. Therefore, similar to Plaintiffs' NJCFA claim, Plaintiffs' claim of violation of the implied covenant of good faith and fair dealing fails.

Charles Bloom & Co. v. Echo Jewelers, 652 A.2d 1238, 1243 (N.J. Super. Ct. App. Div. 1995). However, a corporate officer or director may be personally liable if he: (1) commits a tort in his individual capacity; (2) directs the tortious act; or (3) participates or cooperates in the commission of the tort. Id. A predicate to liability, however, is that the "corporation owed a duty of care to the victim, the duty was delegated to the officer or director and the officer or director breached the duty of care by his own conduct." Saltiel d/b/a Edgewater Design Assoc. v. GSI Consultants, Inc., 788 A.2d 268, 272 (N.J. 2002) (citing 3A William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 1137 (rev. perm. ed. 1994) (footnotes omitted)). Moreover, an individual officer is also liable for the conduct of the corporation if: (1) the corporation is organized and operated as a mere instrumentality, or alter ego, of the officer, (2) the officer uses the corporation to commit fraud, injustice or circumvent the law, and (3) the officer fails to maintain the corporate identity. N. Am. Steel Connection, Inc. v. Watson Metal Prod. Corp., No. 08-4247, 2010 WL 3724518, at *11 (D.N.J. Sept. 14, 2010) (citing Bd. of Tr. of Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 172 (3d Cir. 2002)).

  Plaintiffs argue that Defendants Mozilo and Sambol are liable for creating a "criminogenic" environment at CHL. To advance this theory, Plaintiffs provide a five-page narrative consisting of a variety of conclusory allegations. Perhaps the most concise description of Plaintiffs' theory is captured in the following passage: "As alleged by Plaintiffs, Defendants Mozilo [and] Sambol . . . created and operated a nationwide, interstate enrichment scheme and conspiracy for the creation and sale of lucrative mortgage-based financial instruments on the secondary derivatives market, including mortgages, like the Jatreses', originated through fraud." (Pl.'s Opp'n Br., at 25). Defendants argue that Plaintiffs claim is without merit because Plaintiffs fail to allege that: (1) Defendants breached a duty to Plaintiffs; or (2) violated the

15

corporate form.  Additionally, Defendants argue that Plaintiffs fail to plead fraud with specificity.  (Def.'s Br., at 17).

Plaintiffs' claim against Defendants Mozilo and Rambol fails because the Second Amended Complaint fails to allege that Mozilo or Rambol participated directly in Plaintiffs' loan transaction, or that the Court has a basis for piercing the corporate veil and holding Mozilo and Rambol individually liable for the acts of the corporation.  First, Plaintiffs do not even attempt to plead that Mozilo and Sambol participated in any allegedly fraudulent activity directed towards Plaintiffs.  Plaintiffs' entire claim rests upon the conclusory allegation that Defendants' created a scheme and conspiracy to create and sell mortgage-backed securities by defrauding borrowers.  However, this Court dismissed Plaintiffs' conspiracy and RICO claims in the Opinion dated April 22, 2010, and Plaintiffs failed to plead that Defendants took part in Plaintiffs' loan transaction.  Moreover, Plaintiffs fail to plead that CHL or BOA was an alter ego of Mozilo or Sambol, or that Mozilo or Sambol abused the corporate form.  Finally, as discussed in the previous section, Plaintiffs failed to allege that Mozilo or Sambol, or any defendant named in this litigation, committed any fraud.  Accordingly, Plaintiffs' claims against Mozilo and Sambol are dismissed.

### 2. Defendant Raymer

Defendants argue that Plaintiffs allegations against Defendant Raymer should be dismissed because Raymer's allegedly improper conduct "occurred prior to the injury."  (Def.'s Br., at 17).  Plaintiffs agree with this contention, but argue that Defendant Raymer is liable for participating in a conspiracy to conceal the fraudulent actions of Defendant Reed and other unnamed parties.  (Pl.'s Opp'n Br., at 24).  Because the Court noted in the Opinion dated April 22, 2010 that Plaintiffs failed to state a claim for conspiracy, and Plaintiffs concede that Raymer

did not participate in the alleged scheme to defraud them, Plaintiffs' claims against Raymer are dismissed.

### 3. Defendant Reed

Plaintiffs argue that the Court should not dismiss claims against Defendant Reed for common law fraud, violations of the NJCFA, and breach of the implied covenant of good faith and fair dealing. However, because the Court determined that Plaintiffs failed to state a claim for common law fraud, NJCFA fraud, or breach of the implied covenant of good faith and fair dealing, Plaintiffs' claims against Defendant Reed are dismissed.

### E. Corporate Defendants

Plaintiffs also assert claims against BOA, CHL, CFC, TB, CB, and Recon. However, the underlying basis for each of the claims against the corporate defendants is Plaintiffs' common law fraud, NJCFA, and breach of the implied covenant of good faith and fair dealing claims.[6] Having determined that Plaintiffs failed to state a cognizable claim for any of the aforementioned causes of action, Plaintiffs' claims against BOA, CHL, CFC, TB, CB, and Recon are also dismissed.

Plaintiffs also bring claims against MERS for purporting to serve as a "nominee" for CHL based upon an invalid and unenforceable instrument obtained by fraud, and a claim against BONYM for attempting to enforce an invalid and unenforceable instrument originating from acts of criminal fraud. Because the Court finds that Plaintiffs failed to plead a claim of fraud, the claims against MERS and BONYM are dismissed.

---

[6] Specifically, Plaintiffs bring the following claims against CHL, CFC, TB, CB, and Recon: (1) falsification of data while processing Plaintiffs' loan and concealment of a material fact; (2) conspiracy to conceal the fraudulent actions of Defendant Reed; (3) knowing creation and operation of a corporate environment that invites and rewards fraudulent behavior; (4) direct corporate liability for the allegedly tortious actions of Defendants Rambol, Mozil, and Reed. Defendants bring a successor-in-interest claim against BOA for the acts of CHL.

## IV.  CONCLUSION

For the reasons discussed above, Defendants' motion is GRANTED.  An appropriate order shall issue today.


Date: 12/23/2010                                    /s/ Robert B. Kugler
                                                       ROBERT B. KUGLER
                                                       United States District Judge